**STEAMSHIP MUTUAL UNDERWRIT-
ING ASSOCIATION, LIMITED,
Respondent, Appellant,**

v.

**George H. LANDRY, Libelant, Appellee.**

**No. 5613.**

United States Court of Appeals
First Circuit.

Aug. 10, 1960.

James A. Whipple, Boston, Mass., Kneeland & Splane, Boston, Mass., on the brief, for appellant.

John O. Parker, Boston, Mass., Ely, Bartlett, Brown & Proctor, Boston, Mass., on the brief, for appellee.

Before WOODBURY, Chief Judge, and HARTIGAN and ALDRICH, Circuit Judges.

WOODBURY, Chief Judge.

This is an appeal by the respondent below, a marine insurance company organized under the laws of Great Britain, which we shall refer to hereinafter as Mutual, from a decree ordering that the libelant recover from it the principal sum of $4,325.23 together with interest in the amount of $267.44 and costs. There is no dispute over the facts.

On March 15, 1957, the diesel fishing vessel Mary J. Landry, owned by the li-

belant George H. Landry, collided with and sank the fishing vessel B & E owned by B & E, Inc. The owner of the B & E filed a libel in admiralty in the court below against the Mary J. Landry *in rem* and against George H. Landry, her owner, *in personam*. After hearing, the District Court found (1) that the Mary J. Landry was solely at fault for the collision with the B & E, (2) that on the date of the collision the B & E was worth $20,-000, its gear and supplies were worth $1,970 and its cargo was worth $1,000, (3) that the Mary J. Landry was worth more than the B & E and that, with her catch was "worth no less than $24,000," and, (4) that the respondent in that case, the libelant in this one, George H. Landry, was entitled to limit recovery by the owner of the B & E to the value of the Mary J. Landry and its freight, meaning by that, its catch. The court then entered a decree pursuant to its findings ordering that B & E, Inc., recover from the Mary J. Landry and its owner, George H. Landry, the amount of $22,970 plus interest from March 16, 1957, in the amount of $1,355.23, making a total sum of $24,325.23, with costs.

At the time of the collision the Mary J. Landry was covered by three policies of insurance. Two of these were on its "Hull and Machinery etc. valued $20,-000," one in the amount of $6,000 and the other in the amount of $14,000. The third policy was a P and I (protection and indemnity) policy issued by Mutual in the amount of $50,000. Both policies on the hull provided that "Subject to the conditions of AMERICAN HULL FORM as attached" the insurers would pay the insured up to the amount of the policy for loss of the Mary J. Landry from a number of "Adventures and Perils" with none of which we are here concerned, for that vessel was not damaged in the collision. These policies also provided coverage for liability in the following language quoted in material part from a rider attached to the policies entitled "American Institute TIME (HULLS) December, 1955":

"And it is further agreed that if the Vessel hereby insured shall come into collision with any other Ship or Vessel and the Assured * * * in consequence of the insured Vessel being at fault shall become liable to pay and shall pay by way of damages to any other person or persons any sum or sums in respect of such collision, we, the Underwriters will pay the Assured * * * such proportion of such sum or sums so paid as our respective subscriptions hereto bear to the value of the Vessel hereby insured, provided always that our liability in respect to any one such collision shall not exceed our proportionate part of the value of the Vessel hereby insured. And in cases where the liability of the Vessel has been contested, or proceedings have been taken to limit liability, with the consent in writing of a majority (in amount) of Hull Underwriters, we will also pay a like proportion of the costs which the Assured * * * shall thereby incur, or be compelled to pay * * *."

This provision embodies what is known as the "four-fourths running down clause" to be referred to hereinafter.[1]

The P and I policy written by Mutual with which we are here primarily concerned covered the " 'Mary J. Landry'

---

1. It was formerly the custom in the United States, and is the custom in Great Britain today, not to write running down clauses to cover more than three fourths of the damage sustained. The theory behind the hull insurers' refusal to write full coverage was to insure that the shipowners should be substantially interested in the safe navigation of their vessels. Shipowners, however, due to the increasing value of the interests engaged in marine adventure, have sought further protection against the risks involved, and this appears to be one reason for the development of the modern clubs, or mutual insurance associations. It clearly appears that one of the risks covered by these associations is one-fourth of the collision damage to other ships and their cargoes. See Arnould, Marine Insurance 81, 251, 796 (13 ed. 1950).

Wood Diesel Fishing Vessel (Valued $20,000)" up to the policy limit of $50,-000 "in respect of the Protection and Indemnity Risks covered under the Rules specified within * * *." Rule 1(d) under the heading "Risks Covered," reads:

"1.—The Member is protected and indemnified as Shipowner in respect of liabilities and expenses which he shall have become liable to pay and shall have in fact paid in respect of the vessel named herein for the following:—

\* \* \* \* \* \*

"(d) Loss of or damage to any other vessel or craft or to the freight thereof or property thereon, caused by collision with the vessel named herein, in so far as such liability would not be covered by insurance under the standard form of policy on hull, machinery, etc., issued by the American Marine Insurance Syndicate (including the four-fourths Running Down Clause.)"

In addition Rule 2, under the heading "General Conditions," excepts from the insurers liability:

"Claims for any loss, damage, liability, or expense which would be payable under an insurance under the present standard form of policy of the American Marine Insurance Syndicate on hull and machinery, etc. * * * and sufficient in amount to pay such loss, damage, liability or expense in full."

The hull insurers paid the limits of their policies amounting together to $20,000 in satisfaction of the judgment obtained by the owner of the B & E against the Mary J. Landry and George H. Landry, her owner, and George H. Landry himself paid the balance of the judgment. He then brought the present libel against Mutual to recover the amount he had paid over and above the $20,000 paid by the hull insurers, and also other sums, which he claimed were due and owing to him by Mutual under the terms of its P and I policy.

The court below was not only concerned with the question whether Mutual was liable to Landry at all under its policy but, if it answered that question in the affirmative, with the question of the amount of that liability, that is, whether certain items of loss claimed by Landry were properly collision losses. We, however, do not have any problem as to the amount of Mutual's possible liability. We are concerned only with whether Mutual is liable for anything at all, for the only question posed in its brief is "Whether the excess of collision liability paid under the Four-Fourths Running Down clause of a standard form of hull policy issued by the American Marine Insurance Syndicate is payable under the collision clause of a P & I policy?"[2] The District Court answered this question in the affirmative and we agree.

The appellant's basic contention in the court below and in this court is that its P and I policy does not operate as an excess collision policy; that clause 1(d) of the risks covered quoted above should not be construed as providing liability coverage in excess of the liability coverage provided in the hull policies. Stated another way, the contention is that clause 1(d) has reference to a type or kind of liability, not to an amount which might be recovered; that it provides coverage for liabilities of the shipowner-insured not covered at all by such insurance as would be provided by insurance under the American standard form of hull policy, not that it covers liability for amounts in excess of the coverage provided by such policies.

The District Court we think quite correctly rejected this contention. It first ruled that English law governed

2. From the way this question is worded and from lack of any indication to the contrary we take it that the appellant concedes that the hull policies in fact were written in the standard form issued by the American Marine Insurance Syndicate.

the interpretation and construction of Mutual's contract of insurance for the reason that the contract was written in England where the insurer conducted its business and there was nothing to show that the parties intended the law of any other jurisdiction to apply. We agree, if, indeed it makes any difference whether the law of England or the law of this country applies, for, as the court below pointed out, the question presented must be resolved largely by application of general principles applicable to the interpretation and construction of contracts of insurance and we are not aware of any pertinent significant difference between the general principles applicable in England and those applied in this country.

■ The meaning of the language used in Rule 1(d), particularly as that language is reinforced by the quoted exclusionary language from Rule 2, seems to us almost too plain and obvious to admit of argument. The literal meaning of the language is that coverage is provided in excess of the coverage provided in standard American hull policies. It seems to us evident that when Mutual undertook to protect and indemnify Landry as shipowner with respect to liabilities paid by him "in respect of" his vessel for loss or damage to other vessels and the freight or property thereon caused by collision with his vessel "in so far as such liability would not be covered by insurance under the standard form of policy on hull, machinery, etc., issued by the American Marine Insurance Syndicate" it definitely undertook to cover him for collision losses he might become liable for and pay in excess of those which could possibly be covered by insurance on the hull and machinery of his boat when written in the current standard American form. It would put a strain on the language of the P and I policy to give it any other meaning and we see no good reason for doing so. In short, we agree with the District Court that the word "would" in Rule 1(d) and Rule 2 means "could" so that the P and I policy gives protection for collision losses which could not be covered by an Ameri-

can hull policy in standard form regardless of whether collision losses were in fact actually covered by any existing hull policy or not. Taking this view of the policy language, the amount of the coverage provided by the two hull policies in effect on the date of the collision is immaterial. The pertinent inquiry is whether hull insurance could have been written to cover the collision losses found by the court below to have been sustained by Landry in excess of the value of his vessel without the addition of riders, usual or unusual, to the standard American hull policy.

The hull policies, as we have already pointed out, cover loss or damage to the insured vessel from specified risks and they also cover the owner for certain of his liabilities to others. The policies insure against both loss of property and liability to others. As to loss of the vessel they naturally would not be written for more than the value of the vessel, as to which there is no dispute here, for all three policies valued the vessel at $20,000 and the court below on adequate evidence found that to be the actual value of the vessel at all material times. The hull policies covered liability to the same limit as the limit of coverage for loss. And to support the District Court's conclusion there is ample evidence that this is the standard form in which these policies are written in this country. There is evidence, to be sure, that hull and machinery policies might be written with what is called a dual valuation, that is, a valuation for loss in the amount of the actual value of the vessel and another higher valuation for the purpose of liability. The evidence, however, is that not only would it be unusual to write a hull and machinery policy with dual values but also that to do so would require a rider attached to the standard form of such policies and perhaps also alterations of the standard printed form itself. Thus, although hull and machinery policies can be written limited to the value of the vessel with respect to actual or constructive total loss and with a higher value with respect to the limit of liabili-

ty for collision losses, there can be no doubt that to do so would be materially to alter the standard form of such policies as written in America. We agree with the District Court that hull and machinery policies in the standard form in use in America cover the liability of the shipowner for collision losses up to the value of his vessel for the purposes of its loss, and not for any greater amount.

Judgment will be entered affirming the judgment of the District Court.